Desmond T. Barry, Jr.
CONDON & FORSYTH LLP
7 Times Square
New York, NY 10036
(212) 490-9100

Liaison Counsel for Plaintiffs/Aviation Parties

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

AMERICAN AIRLINES, INC.; AMR               :
CORPORATION; UNITED AIRLINES, INC.; UAL    :
CORP.; US AIRWAYS GROUP, INC.; US          :
AIRWAYS, INC.; DELTA AIR LINES, INC.;      :
CONTINENTAL AIRLINES, INC.; AIRTRAN        :
AIRWAYS, INC.; COLGAN AIR, INC.;           :
ARGENBRIGHT SECURITY, INC.; GLOBE          :
AVIATION SERVICES CORPORATION; GLOBE       :
AIRPORT SECURITY SERVICES, INC.;           :
HUNTLEIGH USA CORP.; ICTS                  :
INTERNATIONAL NV; THE BOEING               :
COMPANY; THE MASSACHUSETTS PORT            :
AUTHORITY; AND THE METROPOLITAN            :
WASHINGTON AIRPORT AUTHORITY               :
                                           :
                                           :
            Plaintiffs/Aviation Parties,   :
                                           :
        -against-                          :
                                           :
CENTRAL INTELLIGENCE AGENCY and            :
GENERAL MICHAEL V. HAYDEN in his Official  :
Capacity as Director of the Central Intelligence  :
Agency.                                    :
                                           :
            Defendants.                    :
                                           :
                                           :
                                           :
-------------------------------------------------------------- x

07 CV 7050

**COMPLAINT**

This Action relates to
In re September 11th Litigation,
No. 21 MC 97 (AKH) and
In re September 11th Property
Damage and Business Loss
Litigation, No. MC 101 (AKH)

Plaintiffs American Airlines, Inc.; AMR Corporation; United Airlines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; and the Metropolitan Washington Airport Authority (collectively, "Aviation Parties") allege as follows:

## INTRODUCTION

This suit asks the Court to set aside the final agency action of the Central Intelligence Agency (the "CIA") refusing to permit the Aviation Parties to depose two witnesses, identified by the code-names "John" and "Mary," who have first-hand knowledge of facts that are directly relevant to the Aviation Parties' defense in the personal injury, wrongful death, and property damage litigations arising out of the September 11, 2001 terrorist attacks, *In re September 11 Litigation*, 21 MC 97 (AKH) and *In re September 11 Property Damage and Business Loss Litigation*, 21 MC 101 (AKH) (collectively, "September 11 Litigations").

John has been identified as the former Deputy Chief of the CIA's Usama Bin Laden Unit (the "UBL Unit") in 2001, while Mary has been identified as an FBI Special Agent detailed to the UBL Unit. By virtue of investigations they carried out before September 11, 2001, both John and Mary are believed to have information regarding two of the hijackers who carried out the September 11 terrorist attacks, Khalid al-Mihdhar and Nawaf al-Hazmi. Both witnesses also are knowledgeable as to the information the

2

federal intelligence community had in its possession before September 11, 2001 concerning the terrorist threat that al-Mihdhar, al-Hazmi, al-Qaeda, and Usama Bin Laden posed to civil aviation in the United States.

The information that the Aviation Parties seek from these witnesses is therefore clearly relevant to the September 11 Litigations and of national importance. As one of the intelligence agencies of the federal government responsible for gathering intelligence, the CIA was a central part of the system designed to guard against the type of unprecedented terrorist attacks that al-Qaeda executed on the United States on September 11, 2001. CIA witnesses such as John and Mary thus have direct knowledge of facts that are relevant to at least two critical issues in the September 11 Litigations: (1) whether the Aviation Parties' actions were the proximate cause of the injuries of the plaintiffs in the September 11 Litigations; and (2) whether the defendants' actions were reasonable in light of all of the circumstances, which is the standard the Court has suggested it may apply to some of the plaintiffs' claims.

Yet, the CIA issued a boilerplate letter to the Aviation Parties, barring both John and Mary – only one of whom has ever been directly employed by the agency – from providing relevant testimony in the September 11 Litigations. *See* Exhibit 1.

Given the importance of the factual evidence sought by the Aviation Parties, the minimal burden that the CIA may experience in connection with two depositions is not a sufficient reason to block them from going forward. The agency's blanket refusal to permit either deposition is a decision that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and it should not be permitted to stand.

3

## PARTIES

1.    Plaintiffs – American Airlines, Inc.; AMR Corporation; United Airlines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; and the Metropolitan Washington Airport Authority (collectively, "Aviation Parties") – are all defendants in the September 11 Litigations, which are consolidated before this Court pursuant to the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (the "ATSSA"). Each of the Aviation Parties is either a commercial air carrier, airport authority, security company, or aircraft manufacturer.

2.    Defendants – the Central Intelligence Agency, and General Michael V. Hayden, in his official capacity as the Director of the Central Intelligence Agency – denied the Aviation Parties' request to depose two fact witnesses who were either employed by or detailed to the CIA in 2001.

4

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, which authorizes the Court to hold unlawful and set aside final CIA actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, including the agency's unwarranted refusal to permit discovery that has been requested in accordance with the so-called "*Touhy* regulations" set forth at 32 C.F.R. Part 1905.

4.     Jurisdiction and venue are also proper in this Court pursuant to § 408(b)(3) of the ATSSSA, which vests the United States District Court for the Southern District of New York with original and exclusive jurisdiction over all actions brought for any claim resulting from or relating to the terrorist-related aircraft crashes of September 11, including the refusal to permit third-party depositions of witnesses with first-hand knowledge of facts relevant to the September 11 Litigations.  Pursuant to the ATSSSA, in the September 11 Litigations, "the general discovery process must be controlled by the very capable judges of the Southern District of New York, the only court with jurisdiction over the Civil Plaintiffs' causes of action." *U.S. v. Moussaoui*, 483 F.3d 220, 239 (4th Cir. 2007).

## FACTUAL ALLEGATIONS

THE UNPRECEDENTED TERRORIST ATTACKS OF
SEPTEMBER 11, 2001

5.    On the morning of September 11, 2001, nineteen terrorists affiliated with the terrorist group al-Qaeda executed unprecedented suicide attacks on the United States. Divided into four groups, the terrorists boarded and then hijacked four commercial flights with the objective of intentionally crashing the airplanes into targets on the ground. The terrorists crashed two of the airplanes, American Airlines Flight 11 and United Airlines Flight 175, into the North and South Towers, respectively, of the World Trade Center in New York City.    A short time later, American Airlines Flight 77 crashed into the Pentagon in Virginia and United Airlines Flight 93 crashed into an open field near Shanksville, Pennsylvania.

6.    Khalid al-Mihdhar and Nawaf al-Hazmi have been identified as two of the five terrorists who hijacked and commandeered American Airlines Flight 77 before crashing it into the Pentagon.

7.    In recognition of the American public's deeply-felt need to learn what happened on September 11 and understand the events that led up to the terrorist attacks, Congress and the President created the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"). The 9/11 Commission was given a sweeping mandate to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to commercial aviation, and to present its final report to the President, Congress and the American public. *The 9/11 Commission*

*Report: Final Report of the National Commission on Terrorist Attacks Upon the United States*, xv (2004) *("The 9/11 Commission Report").*

8.    Through the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, Congress also formed its own Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 (the "Joint Intelligence Inquiry").    The Joint Intelligence Inquiry specifically examined and reported on the activities of the U.S. intelligence community in connection with events leading up to the September 11 terrorist attacks.

9.    In the immediate aftermath of the terrorist attacks, Congress enacted the ATSSSA.    Through the Act, Congress created an exclusive federal cause of action for all claims resulting from or relating to the September 11 terrorist attacks.    The ATSSSA, § 408(b)(3).    Congress also designated the United States District Court for the Southern District of New York as the only court with jurisdiction to hear such actions.    *Id.*

<u>THE SEPTEMBER 11 LITIGATIONS</u>

10.    Multiple claimants filed negligence actions against the Aviation Parties, seeking to recover for injuries and fatalities, property damage, and business loss that resulted from the September 11 terrorist attacks.    The individual Aviation Parties named in these suits are commercial air carriers, airport authorities, security companies, and an aircraft manufacturer.    The claimants seek to impose billions of dollars in liability against the Aviation Parties for their alleged failure to detect and halt the terrorists who attacked the United States on September 11.

11.   Pursuant to the ATSSSA, the multiple litigations against the Aviation Parties were consolidated before the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York, in *In re September 11 Litigation*, 21 MC 97 (AKH) and *In re September 11 Property Damage and Business Loss Litigation*, 21 MC 101 (AKH).

12.   Through their pleadings, discovery demands, and questions in deposition discovery, the plaintiffs in the consolidated September 11 Litigations have alleged that the Aviation Parties' conduct was deficient in certain respects and that because of these deficiencies, the Aviation Parties negligently failed to prevent the terrorist attacks. Specifically, the plaintiffs are claiming or have indicated that they are likely to claim that: (1) the Aviation Parties had primary responsibility to assess the threat posed by terrorists in general and al-Qaeda in particular to domestic civil aviation, and that the Aviation Parties could have prevented the September 11 terrorist attacks if they had properly carried out this responsibility; (2) the Aviation Parties should have identified and stopped the nineteen terrorists who carried out the attacks before they boarded the hijacked aircraft; (3) the Aviation Parties could have and should have detected whatever items the terrorists used as weapons on September 11; and (4) the Aviation Parties should have anticipated a suicide hijacking and implemented security procedures that would have provided an effective defense against such attacks.

8

CIA WITNESSES ARE KNOWLEDGEABLE ABOUT
THE SEPTEMBER 11 TERRORIST ATTACKS

13.    Together with the FBI, the CIA was one of the intelligence agencies of the federal government responsible for collecting intelligence on and investigating possible terrorist threats to the United States at the time of the September 11 attacks.

14.    The CIA describes its purpose as to be "the nation's first line of defense," a mission which it carries out by "[c]ollecting information that reveals the plans, intentions and capabilities of our adversaries and provides the basis for decision and action," and "[p]roducing timely analysis that provides insight, warning and opportunity to the President and decision makers charged with protecting and advancing America's interests." *See* Central Intelligence Agency, "CIA Vision, Mission & Values," https://www.cia.gov/about-cia/cia-vision-mission-values/index.html.

15.    One of the CIA's responsibilities, both before and since the September 11 terrorist attacks, was to collect intelligence regarding the threat of terrorist attacks against civil aviation by al-Qaeda or Usama Bin Laden.

16.    In September 2001, the CIA also contributed to the process by which the Federal Aviation Administration (the "FAA") determined whether new security countermeasures were necessary to protect civil aviation. The CIA evaluated the intelligence it had collected and determined whether the threat of terrorist attacks had materially changed such that the information should be shared with the FAA. The FAA, in turn, would then direct commercial airlines and airport authorities to implement any

9

amended security procedures that it determined were an appropriate response to the intelligence that had been conveyed by the CIA.

17.    As a result of the CIA's role in gathering intelligence on al-Qaeda's terrorist activities, CIA agents and detailees, such as John and Mary, have first-hand knowledge of several factual topics that are relevant to the September 11 Litigations, including: (1) the means and methods by which the terrorists planned and carried out the September 11 terrorist attacks, including steps the terrorists took to minimize the chance that they would be detected or stopped; (2) al-Qaeda's means, methods, and motives for carrying out terrorist attacks similar to those perpetrated on September 11, including the training it provided to its operatives and al-Qaeda's resources; (3) the information that was known to the CIA and the federal government before September 11 regarding the potential threat of terrorist attacks on commercial civil aviation by al-Qaeda or Usama Bin Laden; (4) the specific information that was known to the CIA and the federal government before September 11, 2001 regarding the nineteen terrorists who carried out the September 11 terrorist attacks, including Khalid al-Mihdhar and Nawaf al-Hazmi; and (5) the assessment that the CIA had made before September 11 regarding the intelligence it had collected concerning the terrorist threat posed by al-Qaeda, Usama Bin Laden, or any of the nineteen September 11 hijackers, including whether the intelligence was specific enough to be actionable or required the implementation of different civil aviation security countermeasures.

## THE AVIATION PARTIES PROPOSED DEPOSING TWO FACT
## WITNESSES WHO HAD WORKED AT THE CIA

18.   The Aviation Parties seek to depose a very limited number of current and former employees of the federal intelligence agencies who have direct knowledge of facts relevant to the September 11 Litigations.

19.   On March 6, 2007, the Aviation Parties advised the federal government of their intention to depose a select number of witnesses who were current or former FBI or CIA employees by a letter addressed to Beth E. Goldman, Esq. and Sarah S. Normand, Esq., Assistant United States Attorneys for the Southern District of New York (the "March 6 Letter").

20.   The March 6 Letter identifies seven fact witnesses, including Mary and John.

21.   The Aviation Parties addressed the March 6 Letter to the offices of the United States Attorney for the Southern District of New York pursuant to an agreement with that office, which has been longstanding counsel for the federal government as intervenor in the September 11 Litigations.

22.   Since July 2002, the office of the United States Attorney for the Southern District of New York has represented the federal government in the September 11 Litigations to protect information designated by the government as "sensitive security information." *See Mariani v. United Airlines, Inc.*, No. 01 Civ. 11628 (AKH) (S.D.N.Y. Jul. 24, 2002) (provisional order granting Government's motion to intervene and for consolidation).

23.    The Aviation Parties addressed the March 6 Letter to the offices of the United States Attorney for the Southern District of New York with the understanding that the request would be forwarded to the appropriate CIA staff and officials for their consideration.

24.    In requesting deposition testimony, the Aviation Parties complied with the applicable "*Touhy* regulations" set forth at 32 C.F.R. Part 1905, which govern requests for discovery from CIA employees, by attaching detailed supporting affidavits that identify the reasons the testimony sought is relevant to the September 11 Litigations and the proposed topics for each deposition.

25.    The only CIA employee that the March 6 Letter lists is a witness identified by the code-name "John" in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.). Upon information and belief, John was the Deputy Chief of the CIA's Usama Bin Laden Unit and was detailed to FBI Headquarters in 2001.

26.    The affidavit setting forth the proposed topics for the deposition of John and the relevance of his testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 2.

27.    The March 6 Letter also lists a witness identified by the code-name "Mary." Mary was identified in *U.S. v. Moussaoui* as an FBI Special Agent who was detailed to the Usama Bin Laden Unit ("UBL Unit") in the Counterterrorism Section of the CIA from 1998 through 2001.

28.    The affidavit setting forth the proposed topics for the deposition of Mary and the relevance of her testimony to the September 11 Litigations, which the Aviation Parties enclosed with the March 6 Letter, is attached as Exhibit 3.

29.    Based on the evidence presented in *U.S. v. Moussaoui*, in 2001 both John and Mary collected substantial intelligence information concerning al-Qaeda, Usama Bin Laden, and their operatives.

30.    Indeed, before September 11, 2001, John and Mary had begun to investigate Khalid al-Mihdhar and Nawaf al-Hazmi, including their connection to al-Qaeda, their apparent involvement in terrorist plots overseas, and the possibility that both men were in the United States.

31.    John authored a statement concerning the intelligence that he and others in the CIA and FBI had collected concerning Khalid al-Mihdhar and Nawaf al-Hazmi, which was read into the record in a proceeding open to the public in *U.S. v. Moussaoui*.

32.    A copy of John's statement remains available to the public on the Website established by the United States District Court for the Eastern District of Virginia.

33.    John was also interviewed by the 9/11 Commission and is frequently cited as an authority on these topics in the *The 9/11 Commission Report*.

34.    Mary also authored a statement concerning the intelligence that the federal government had collected concerning Khalid al-Mihdhar and Nawaf al-Hazmi, which was read into the record in a proceeding open to the public in *U.S. v. Moussaoui*.

35.    A copy of Mary's statement remains available to the public on the Website established by the United States District Court for the Eastern District of Virginia.

36.   Mary was also interviewed by the 9/11 Commission and is frequently cited as an authority on these topics in the *The 9/11 Commission Report*.

### JOHN AND MARY ARE KNOWLEDGEABLE OF FACTS DIRECTLY RELEVANT TO THE SEPTEMBER 11 LITIGATIONS

37.   If deposed, John and Mary are likely to offer testimony relevant to the critical issue of whether the Aviation Parties' actions were the proximate cause of the injuries of the plaintiffs in the September 11 Litigations.

38.   It is a basic tort law principle that the claimants in the September 11 Litigations must establish that the Aviation Parties' actions were the proximate cause of their alleged injuries to recover damages under a negligence theory.

39.   The proximate cause of a legal injury is often defined by the law as "a substantial factor in bringing about the harm." *See* Restatement (Second) of Torts § 431 (1965); *see also Derdiarian v. Feliz Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980); *Marchant v. Boddie-Noell Enters.*, 344 F. Supp. 2d 495, 497 (W.D. Va. 2004); *Hicks v. Metro Edison Co.*, 665 A.2d 529, 534 (Pa. Commw. Ct. 1995). The Aviation Parties are therefore entitled to present evidence indicating that the success of the September 11 terrorist attacks did not depend upon the negligence of any of the Aviation Parties and that there were other possible causes of the injuries of the plaintiffs in the September 11 Litigations beyond the actions of the Aviation Parties.

40.   Evidence indicating that al-Qaeda and the specific terrorists who carried out the September 11 terrorist attacks were sophisticated, ideologically driven, and well-financed terrorists is precisely the type of relevant evidence regarding proximate cause

that the Aviation Parties are entitled to present. Such evidence would establish or tend to establish that the terrorists would have succeeded in executing the September 11 attacks, irrespective of any alleged action or inaction by the Aviation Parties. For example, if the terrorists invented around the aviation security procedures in place at the time of the September 11 attacks by using items to commit the hijackings that the FAA permitted passengers to carry aboard commercial flights – or if the terrorists were committed to proceeding with the suicide attacks regardless of whether they were able to carry on all of the items they planned to use as weapons aboard the flights – the conduct of the Aviation Parties cannot be a substantial cause of the injuries allegedly caused by the terrorist attacks.

41.    Evidence of al-Qaeda's ideological motivation and *modus operandi* for committing terrorist attacks on civil aviation is therefore directly relevant to the important issue of proximate cause in the September 11 Litigations.

42.    It is also the type of evidence about which John and Mary are likely to have extensive and direct knowledge because of their in-depth investigation into al-Qaeda and into the activities of al-Mihdhar and al-Hazmi in particular.

43.    John and Mary are also likely to be able to provide direct testimony about the facts and circumstances surrounding the inability of the federal intelligence agencies to specifically identify, uncover and halt the plot to commit the September 11 terrorist attacks, despite the intelligence the agencies had gathered before September 11, 2001 regarding al-Qaeda, al-Mihdhar and al-Hazmi.

44.   The Aviation Parties also expect John and Mary to offer testimony that assists the Aviation Defendants in establishing that if al-Mihdhar and al-Hazmi had been placed on the FAA "no-fly" list before September 11, the attempt by the terrorists to hijack American Airlines Flight 77 would in all probability have been prevented.

45.   Evidence of this sort is directly relevant to the issue of proximate cause in the September 11 Litigations. The Aviation Parties are entitled to show that operations conducted by the federal intelligence agencies were the most effective way to uncover and stop the September 11 terrorist attacks and that the inability of the federal intelligence agencies to detect and stop the plot – for instance, by placing al-Mihdhar and al-Hazmi on a "no-fly" list  – is a more significant causal circumstance of the terrorist attacks than any allegedly negligent conduct of the Aviation Parties.

46.   It is also a fundamental principle of tort law that a plaintiff cannot recover in a negligence action if the defendant's actions were reasonable in light of all of the circumstances.    Therefore, evidence that the Aviation Parties acted reasonably in September 2001 in taking precautions to guard against terrorist attacks on civil aviation is also relevant to the September 11 Litigations.

47.   As a matter of basic tort law, relevant evidence of whether a defendant acted reasonably includes evidence of the conduct of others under substantially similar circumstances. *See* 2 *Wigmore on Evidence* §§ 461, 442 (Chadbourne rev. 1970).

48.   Because the CIA and the Aviation Parties both participated in an integrated civil aviation security system at the time of the September 11 terrorist attacks, the CIA's response to and assessment of the potential terrorist threat to civil aviation posed by al-

Qaeda or Usama Bin Laden is an appropriate consideration for the trier of fact to take into account in evaluating the Aviation Parties' response to the same threat.

49.    Under the then existing civil aviation security system, the CIA was responsible for intelligence gathering and terrorist threat assessment. The agency also contributed to the FAA's determinations as to which countermeasures were an appropriate response to the terrorist threat by determining which information should be shared with the FAA. The Aviation Parties, in turn, were responsible for implementing the countermeasures required by the federal government. Thus, the CIA and the Aviation Parties were both participants in an aviation security system that was intended to prevent a terrorist attack against civil aviation. It is therefore appropriate for the trier of fact to take into account the steps the CIA took to guard against the threat of a terrorist attack on civil aviation in evaluating whether the Aviation Parties took reasonable steps in response to the same threat.

50.    Evidence regarding the steps the CIA considered appropriate in light of the intelligence concerning the terrorist threat that the agency had available to it also helps to place the Aviation Parties' conduct in context. Precluding evidence of the CIA's role in assessing the terrorist threat posed by al-Qaeda would create the false impression that the Aviation Parties were independently responsible for evaluating terrorist threats to civil aviation, and set a false baseline for the jury's determination of whether the Aviation Parties took reasonable steps to prevent the September 11 terrorist attacks.

51.    As a government intelligence agency, the CIA also had access to far more intelligence information concerning the terrorist threat and the September 11 hijackers

17

than the Aviation Parties, all of whom are private entities. It would be illogical and prejudicial to prevent the Aviation Parties from taking discovery that establishes or tends to establish that the CIA had access to superior information on the terrorist threat, and that the CIA did not implement (or recommend that the FAA or the Aviation Parties implement) any additional security measures based on this information.

## THE CIA'S REFUSAL TO GRANT THE AVIATION PARTIES' REQUEST WAS ARBITRARY AND CAPRICIOUS

52.    Despite the relevance of the testimony that the Aviation Parties are seeking from John and Mary and despite the fact that both agents have made publicly available statements regarding the same topics about which the Aviation Parties seek to question them, the CIA denied the Aviation Parties request to depose both witnesses.

53.    On May 1, 2007, the Office of the General Counsel of the CIA sent a letter to the Aviation Parties summarily refusing to permit either John's or Mary's deposition to go forward (the "Refusal").

54.    On May 7, 2007, through its counsel in the office of United States Attorney for the Southern District of New York, the FBI also issued a series of boilerplate letters refusing the Aviation Parties' request to depose the other five witnesses listed in the March 6 letter.

55.    The CIA's Refusal appears to be a standard, form response to a *Touhy* request. Indeed some of the language it uses is identical to the separate refusals issued by the FBI.

56.    The Refusal describes the CIA's proferred reasons for barring the depositions in broad terms. Beyond a general statement that the deposition discovery

18

sought is "overly broad and unduly burdensome," and "exceeds the scope of permissible discovery," the CIA alleges that it is blocking the requested depositions from going forward for five reasons: (1) the request does not sufficiently explain the relevance of the testimony sought to the September 11 Litigations; (2) some of the information contained in the testimony sought may be classified, reflect intelligence sources or methods, or otherwise be privileged; (3) some of the testimony sought "may contain information that originated with other Government departments or agencies," requiring the CIA to coordinate its response with these departments or agencies; (4) the testimony sought is duplicative to the extent that the information is available from publicly available secondary sources, such as *The 9/11 Commission Report*; and (5) requiring John and Mary to appear for deposition may place them at risk.

57.    The CIA's blanket refusal to permit the Aviation Parties to take two depositions regarding facts that are of central importance both to the September 11 Litigations and the public at large is an arbitrary and capricious final agency action that should not be permitted to stand.

58.    The Aviation Parties are seeking relevant testimony regarding information that Congress has recognized that the national public has a commonly shared need to know and understand: what happened during the shocking terrorist attacks of September 11 and what events made it possible for the terrorists to execute the attacks.

59.    Congress has clearly evidenced its intention that the full-story of the September 11 terrorist attacks, including the role of the CIA in investigating and preventing such threats to the United States, be told. The 9/11 Commission and the Joint

Intelligence Inquiry were initiated precisely to report to the American public on these issues. Congress also recently revised the statute governing "sensitive security information" to liberalize access to information held by agencies such as the CIA, including information concerning the September 11 terrorist attacks. *See* Section 525 of the Department of Homeland Security Appropriations Act, 2007, #109 Pub. L. No. 295, § 525, 120 Stat. 1355 (2006).

60.    Congress also demonstrated the national importance of the September 11 Litigations by creating – only days after the terrorist attacks – an exclusive federal cause of action for all claims arising out of the terrorist attacks, which can only be heard in a single federal forum, the United States District Court for the Southern District of New York. *See* The ATSSSA, §408.

61.    In light of the importance of the testimony sought by the Aviation Parties to both the public as a whole and the September 11 Litigations, the CIA's objections are not a sufficient reason to prevent the two depositions from going forward.

62.    First, the CIA's contention that the Aviation Parties could seek from other sources information about which it seeks to depose the two witnesses overlooks the fact that secondary sources are not satisfactory substitutes for evidence taken directly from witnesses with first-hand knowledge of the underlying facts. Direct testimony is less likely to raise issues regarding the admissibility of the information as evidence at trial and is more likely to prove persuasive to the trier of fact. Deposition discovery also would permit all parties in the September 11 Litigations to ask specific questions targeted to

elicit information directly relevant to the issues at stake in those litigations, such as proximate cause and the reasonableness of the Aviation Parties' conduct.

63.    Second, the CIA's objection that the requested testimony may implicate privileged information is directly inconsistent with its assertion that much of the same information is available from secondary sources.  As the CIA concedes, much of the information about which the Aviation Parties seek to depose the two witnesses has already been widely publicly disclosed.  The agency, therefore, overstates the extent to which privileged information may be implicated in the requested depositions.

64.    The requested depositions are also unlikely to raise privileged information because the Aviation Parties are primarily seeking discovery from fact witnesses about the events of September 11 and the actions of the terrorists.  The Aviation Parties are seeking virtually no information concerning the CIA's deliberative process or investigative techniques that might be protected by an applicable privilege.

65.    To the extent that individual questions posed to the two deponents might brush up against the boundaries of a privileged area of inquiry, the counsel for the CIA is not precluded from attending the deposition with minimal inconvenience and issuing instructions to the witnesses on how to answer those specific questions without revealing privileged information.  Certainly the alternative should not be to permit the CIA to block these depositions from taking place in their entirety because some specific questions *might* implicate potentially privileged information.

66.    Third, the CIA overstates the burden that the two depositions would pose on the agency.  The Aviation Parties are seeking to question only two witnesses about an

extremely narrow series of events and about which they have already provided publicly available statements. Under these circumstances, the inconvenience to the CIA involved in preparing for the depositions is likely to be minimal.

67.    Fourth, any coordination that the CIA might need to do with other government departments or agencies to permit the depositions to go forward is likely to be minimal and not unduly burdensome, given the specific witnesses the Aviation Parties have requested to depose and the topics about which they seek to depose the witnesses. The Aviation Parties are seeking discovery from the CIA witnesses regarding factual information about which, in large measure, the witnesses have first-hand knowledge. To the extent that their testimony may implicate information learned from other government agencies – most likely the FBI – many of those facts and the sources through which the CIA learned them have already been publicly disclosed in the *The 9/11 Commission Report* and the Moussaoui trial.

68.    Finally, the Aviation Parties are highly sensitive to and share the CIA's concern that John and Mary not be placed at risk during the requested depositions. The Aviation Parties stand ready to take whatever steps are necessary during the discovery process to shield John's and Mary's true identities and affiliations. A number of precautions may be taken to protect the witnesses anonymity, including conducting the deposition by telephone, limiting the number of attorneys who attend the deposition and have access to the transcript, and providing the CIA with an opportunity to review the transcript to protect classified or privileged information.

## FIRST CAUSE OF ACTION

(Review and Reversal Under The Administrative Procedure Act)

69.    The Aviation Parties incorporate by reference all allegations set forth in paragraphs 1 to 68 above.

70.    The CIA's blanket refusal to permit the Aviation Parties to depose two witnesses concerning information that is relevant to the September 11 Litigations constitutes a final agency action for the purposes of the Administrative Procedure Act.

71.    The CIA's blanket refusal to permit any deposition to go forward constitutes an agency's action or failure to act in an official capacity.

72.    The CIA's refusal to permit the depositions to go forward should be set aside because that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and because it is an action that deprives the Aviation Parties of evidence that is important to their defense of very serious allegations that have been made against them in litigation of national importance.

## SECOND CAUSE OF ACTION
(Writ of Mandamus)

73.    The Aviation Parties incorporate by reference all allegations set forth in paragraphs 1 to 72 above.

74.    The Aviation Parties' claim for permission to proceed with the requested depositions of a limited number of current and former CIA employees is clear and certain.

75.    The CIA has ignored and/or violated the standards delimiting the manner in which their discretion to permit the requested third party depositions to go forward in the

September 11 Litigations can be exercised by issuing boiler plate refusals, barring any of the requested depositions to go forward.

76. No adequate remedy is available other than the issuance of a writ of mandamus directing that the CIA grant permission for the requested depositions to go forward.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court set aside the final agency action of the CIA refusing to permit any of the depositions sought by the Aviation Parties to proceed or, in the alternative, that the Court issue a writ of mandamus ordering the CIA to permit the requested depositions to go forward, and to award such other and further relief as the Court deems proper.

Dated: New York, New York
July 31, 2007

Respectfully submitted,

CONDON & FORSYTH LLP

By:

Desmond T. Barry, Jr. (DB-8066)
7 Times Square
New York, New York 10036
(212) 894-6770

- and -

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Counsel for American Airlines, Inc.
and AMR Corporation*

*Counsel for United Airlines, Inc. and UAL Corp.*
QUIRK & BAKALOR, P.C.
Jeffrey Ellis
845 Third Avenue, 15th Floor
New York, New York 10022
Telephone: 212-319-1000
Facsimile: 212-319-1065

MAYER, BROWN, ROWE & MAW
Michael R. Feagley
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone: 312-782-0600
Facsimile: 312- 701-7711

*Counsel for US Airways Group, Inc. and US Airways, Inc.*
CAMPBELL, CAMPBELL, EDWARDS &
 CONROY, PROFESSIONAL CORPORATION
Richard P. Campbell
One Constitution Plaza, Third Floor
Boston, Massachusetts 02129
Telephone: 617-241-3000
Facsimile: 617-241-5115

*Counsel for Delta Airlines*
GALLAGHER GOSSEEN FALLER & CROWLEY
Michael J. Crowley
1010 Franklin Avenue, Suite 400
Garden City, New York 11530-2927
Telephone: 516-742-2500
Facsimile: 516-742-2516

*Counsel for Continental Airlines*
ST. JOHN & WAYNE, L.L.C.
Peter B. Van Deventer, Jr.
Two Penn Plaza East
Newark, New Jersey 07105-2249
Telephone: 973-491-3600
Facsimile: 973-491-3555

*Counsel for AirTran Airways*
SATTERLEE STEPHENS BURKE & BURKE
James Rittinger
230 Park Avenue
New York, New York 10169-0079
Telephone: (212) 818-9200
Facsimile: (212) 818-9606

*Counsel for Colgan Air, Inc.*
CONNELL FOLEY, LLP
Jeffrey W. Moryan, Esq.
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973-535-0500
Facsimile: 973-535-1685

*Counsel for Argenbright Security, Inc.*
SIMPSON THACHER & BARTLETT LLP
Joseph F. Wayland
425 Lexington Avenue
New York, New York 10017-3954
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Counsel for Huntleigh USA Corp.*
SUSMAN GODFREY L.L.P.
H. Lee Godfrey
Charles Eskridge
Suite 5100
1000 Louisiana Street
Houston, Texas 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666

MENDES & MOUNT, LLP
Edward J. McMurrer
750 Seventh Avenue
New York, New York 10019-6829
Telephone: 212-261-8000
Facsimile: 212-261-8750

*Counsel for Globe Aviation Services Corporation and*
*Globe Airport Security Services, Inc.*
JONES HIRSCH CONNORS & BULL P.C.
James P. Connors
One Battery Park Plaza
New York, New York 10004
Telephone: 212-527-1000
Facsimile: 212-527-1680

KELLY, LIBBY & HOOPES, P.C.
Paul V. Kelly
175 Federal Street
Boston, Massachusetts 02110
Telephone: 617-338-9300
Facsimile: 617-338-9911

LORD, BISSELL & BROOK
Gary W. Westerberg
111 South Wacker Drive
Chicago, Illinois  60606-4410
Telephone: 312-443-0700
Facsimile: 312-443-0336

*Counsel for ICTS International NV*
MCLAUGHLIN & STERN LLP
David Sass
260 Madison Avenue - 18th Floor
New York, New York 10016
Telephone: 212-448-1100
Facsimile: 212-448-0066

*Counsel for The Boeing Company*
PERKINS COIE LLP
Thomas J. McLaughlin
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Telephone: 206-583-8888

Facsimile: 206-583-8500

RICHARDS KIBBE & ORBE LLP
Brian S. Fraser
One World Financial Center
New York, New York 10281-1003
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

*Counsel for Massachusetts Port Authority*
O'MELVENY & MYERS LLP
Mark Wood
400 South Hope Street
Los Angeles, California 90071
Telephone: 213-430-6220
Facsimile: 213-430-6675

GOODWIN PROCTER LLP
Christopher D. Moore
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Counsel for Metropolitan Washington Airport Authority*
DOMBROFF & GILMORE
Mark Dombroff
Michael Kerns
1676 International Drive, Penthouse
McLean, Virginia 22102
Telephone: 703-336-8800
Telephone: 703-336-8700 (Dombroff)
Facsimile: 703-336-8750