# Exhibit 1

CENTRAL INTELLIGENCE AGENCY
WASHINGTON, D.C. 20505

Office of General Counsel

CONDON & FORSYTH LLP

MAY 0 7 2007

RECEIVED

1 May 2007

**VIA FIRST-CLASS MAIL**

Mr. Desmond T. Barry, Jr., Esq.
Condon & Forsyth LLP
7 Times Square
New York, NY 10036

        Re:  In re September 11 Litigation; In re September 11
             Property Damage and Business Loss Litigation,
             21 MC 97 (AKH); 21 MC 101 (AKH) (S.D.N.Y.)

Dear Mr. Barry:

        This letter is in reference to your 6 March 2007 letter to
Beth E. Goldman and Sarah Normand, seeking the depositions of
two individuals identified as "John" and "Mary."  Your letter
asserts that these individuals were employed by, or detailed to,
the Central Intelligence Agency (CIA) and provided testimony in
the U.S. v. Moussaoui trial (Case No. 01-455A (LMB) E.D. Va.).
The letter and accompanying affidavits assert that you would
like "John" and "Mary" to testify about (1) the performance of
their official duties as alleged CIA employees or detailees, and
(2) information the CIA may or may not have had prior to 11
September 2001.

        Thus, we note that the testimony you seek concerns only the
alleged actions of, and CIA information known to, "John" or
"Mary" in their official capacities as CIA employees or
detailees.  Accordingly, any request that these individuals
provide testimony is governed by United States ex rel. Touhy v.
Ragen, 340 U.S. 462 (1951), 32 C.F.R. Part 1905, and other
applicable statutes, regulations, and rules.

        Your request fails to satisfy our Touhy regulation, 32
C.F.R. Part 1905.  The affidavits accompanying your letter fail
to provide a sufficiently detailed description of the testimony

Desmond T. Barry, Jr., Esq.

sought.  Specifically, the affidavits fail to provide adequate
detail for us to determine whether the information sought may be
classified or otherwise not subject to disclosure pursuant to
applicable statutes, regulations, rules, or privileges.  Your
statements that you only seek testimony concerning areas about
which "John" and "Mary" previously testified does not cure this
defect, as there may be specific information pertaining to these
areas that remains undisclosed and is protected from disclosure.
Such information may include, but may not be limited to, the
identities of covert CIA personnel and whether or not the CIA
has or had certain information.  Accordingly, no further
response is required at this time.

      Even if your letter complied with our Touhy regulations, we
would deny your request for the following reasons.

      First, notwithstanding the representations in your
affidavits that the testimony you seek only covers areas upon
which "John" and "Mary" previously provided testimony, some of
the information you seek to elicit nevertheless may be
classified pursuant to Executive Order No. 12958, as amended by
Executive Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).
Again, such classified information may include, among other
things, the identities of covert CIA personnel and whether or
not the CIA has or had certain information.  To the extent you
seek classified information, or testimony that may disclose
classified information, your request will be denied.  See 32
C.F.R. § 1905.4(c)(3)(iv).

      Second, some of the information you seek may be protected
from unauthorized disclosure under Section 102A(i)(1) of the
National Security Act of 1947, as amended, 50 U.S.C. § 403-
1(i)(1), and Section 6 of the Central Intelligence Agency Act of
1949, as amended, 50 U.S.C. § 403g; or 32 C.F.R.
§ 1905.4(c)(3)(ii).  These statutes and regulation require,
among other things, the Director of National Intelligence (DNI)
and the Director of the CIA (DCIA) to protect intelligence
sources and methods from unauthorized disclosure.  To the extent
you seek testimony covered by these statutes and regulations, we
will deny your request.  Again, simply limiting testimony to the
general areas about which "John" and "Mary" have already
testified, as your affidavits contemplate, does not adequately

Desmond T. Barry, Jr., Esq.

protect against specific unauthorized disclosures.  The fact
that there has been testimony regarding a certain general area
does not mean that all specific information about that matter
has been disclosed; such information remains protected from
disclosure for the reasons set out in this letter.

Third, requiring "John" and "Mary" to appear for deposition
may place them at great personal risk and therefore would run
afoul of the National Security Act of 1947 and the Central
Intelligence Agency Act of 1949.  See § 403-4a(d)(3) (requiring
the DCIA to minimize the risks to those involved in the
collection of human intelligence); 50 U.S.C. § 403g (providing
that the CIA shall be exempt from the provisions of any other
law requiring the publication or disclosure of the organization,
functions, names, and official titles of personnel employed by
the CIA).  In the Moussaoui matter, many steps were taken to
minimize any potential risks to "John" and "Mary," including the
disclosure of their true identities.  They were provided
pseudonyms and they did not testify in person at the trial.
Rather, their substituted testimony was read into the record
pursuant to the Classified Information Procedures Act, 18 U.S.C.
App. 3 – which does not apply in civil litigation.  Asking
"John" and "Mary" to appear for deposition – simply so they can
repeat information already in the public record – would tend to
erode the protections designed to shield their identities and
affiliations, and ultimately would heighten the risk to their
personal safety.  Accordingly, the 1947 and 1949 Acts require
that we deny your request.

Fourth, the testimony you seek may contain information that
may have originated with other Government departments or
agencies.  Before offering testimony concerning such
information, the CIA must coordinate its response with these
departments and agencies.  This coordination process would place
an undue burden on the CIA.

Fifth, some information contained in the testimony that you
seek may be protected from disclosure by the deliberative
process, attorney-client communication, attorney work product,
and law enforcement privileges.  To the extent you may elicit
testimony protected by these privileges, we will deny your
request.

Desmond T. Barry, Jr., Esq.


Sixth, your request for testimony is overbroad and unduly burdensome, and would therefore unduly interfere with the orderly conduct of the CIA's functions. See 32 C.F.R. § 1905.4(c)(3)(vi); Rule 45(c)(3)(A)(iv), Fed. R. Civ. P. Because of the breadth of your request and the privileges and exemptions that may apply, the CIA cannot reasonably comply with your request.

Seventh, your request runs afoul of Rule 26(b)(2), Fed. R. Civ. P., which may limit discovery that is cumulative, duplicative, or available through less burdensome channels. Your representation that you only seek testimony that covers areas about which these individuals have previously testified confirms that you seek information already in the public record. Asking these individuals to testify on these areas yet again not only would yield duplicative information but also would impose a significant and unnecessary burden upon them and the CIA.

Eighth, the wide breadth of your request exceeds the scope of permissible discovery under Rule 26(b), Fed. R. Civ. P. This objection includes, but is not limited to, any improper effort to elicit opinion testimony from "John" or "Mary." Further, your request does not adequately explain, as it must, how the testimony you seek is relevant to any claim or defense in this matter.

Please note that the objections noted in this letter are neither exclusive nor exhaustive. The CIA reserves the right to make further objections. In addition, by asserting these objections, the CIA does not admit that any information responsive to this request exists.

If you have any questions, please feel free to call me at (703) 874-7222.

Sincerely,

Luther B. Pilkinton
Assistant General Counsel

4

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE          Civil No.
AND BUSINESS LOSS LITIGATION                  21 MC 101 (AKH)


- - - - - - - - - - - - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE SEPTEMBER 11TH LITIGATION               Civil No.
                                              21 MC 97 (AKH)


- - - - - - - - - - - - - - - - - - - - - - - - - - - X
STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

1.      I am an attorney admitted to practice before this Court and a member of
the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel
in the above-captioned actions. I make this Affidavit in connection with the Aviation
Defendants' request to depose the witness identified as "John" in *U.S. v. Moussaoui*,
Crim. No. 01-455A (LMB) (E.D.Va.), in accordance with 32 C.F.R. § 1905.4. John is
identified in *U.S. v. Moussaoui* as the former Deputy Chief of the Usama Bin Laden Unit
at the CIA, who was detailed to the FBI Headquarters in the International Terrorism
Operations Section (ITOS) in 2001.

2.      The above-captioned lawsuits seek to impose billions of dollars in liability
against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being sued by approximately six dozen personal injury and wrongful death claimants for injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.      Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues:  what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.      In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the CIA, the FBI, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which

2

that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

5. Together, the CIA and the FBI are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States. Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden. The CIA also decided which specific intelligence regarding the potential threat should be communicated to the FAA and the airlines, including the Aviation Defendants. The intelligence that federal agencies such as the CIA permitted to be communicated to the airlines was one of the Aviation Defendants' primary sources of information regarding the threat of terrorist attacks on civil aviation. Therefore, evidence as to the specific intelligence the CIA recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6. The CIA also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the CIA. The CIA evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA. The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the

3

heightened threat. The intelligence the CIA communicated to the FAA was thus an important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.    The measures that the CIA recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense. As one of the two key intelligence gathering agencies of the federal government, the CIA had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants. Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks. However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures. The measures that the CIA determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.    John is well qualified to testify to these material issues. As Deputy Chief of the Usama Bin Laden Unit at the CIA, he collected intelligence concerning al-Qaeda, Usama Bin Laden, and their operatives. Even before September 11, John had begun to

4

investigate two of the terrorists who later took part in the attacks and the hijacking of American Airlines Flight 77 ("Flight 77"), Khalid al-Midhar and Nawaf al-Hazmi. Because of his work with the Usama Bin Laden Unit and his investigation into two of the hijackers, the Aviation Defendants believe that John has specialized knowledge of the terrorists' intent, likely means of attack, and capabilities.

9.    One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. As the former Deputy Chief of the Usama Bin Laden Unit, John has specific information as to the unique skills and planning that went into the terrorists' plot, including the steps they took in order to evade detection. Accordingly, he is particularly qualified to offer evidence as to the manner in which the terrorists caused the injuries on which the plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of John will establish or tend to establish the following points in support of this defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place. As a result, the success of their plot was not dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10.    The Aviation Defendants also anticipate that John will testify that, before September 11, the CIA and the FBI knew that Khalid al-Midhar and Nawaf al-Hazmi were al-Qaeda operatives and known threats to the United States. They also expect that John will testify that the CIA knew or suspected that both men were present in the United States before September 11. The Aviation Defendants further believe that John will testify that no communication was sent to the FAA requesting that the two men be placed on a "no-fly" list – even though such a list existed. The Aviation Defendants expect that John's deposition testimony and other litigation discovery will help establish that if Khalid al-Midhar and Nawaf al-Hazmi had been placed on a no-fly list they would not have been permitted to board Flight 77 on September 11 and, at a minimum, its hijacking would have been prevented.

11.    By virtue of his position with the CIA's Usama Bin Laden Unit and his detail to the International Terrorism Section at the FBI, John also is well qualified to testify as to the intelligence that was available to both the FBI and the CIA before September 11 concerning the possibility that al-Qaeda or Usama Bin Laden would commit a terrorist attack on the United States and its civil aviation system. John can also testify as to which portions of the intelligence that the FBI and the CIA gathered regarding the threat of a terrorist attack were communicated to the FAA and offer evidence as to what, if any, countermeasures the intelligence agencies suggested that the airlines take in response to the available intelligence.

6

12.    John has already provided a statement to a federal court concerning many of these material issues. In *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.), a statement authored by John attesting to what he would testify to if called as a witness was read into the record in a proceeding open to the public. A copy of John's statement remains available to the public on the website established by the Court at http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/939.pdf.    John was also interviewed about these issues by the National Commission on Terrorist Attacks Against the United States (more familiarly known as the "9/11 Commission") and is frequently cited as an authority on these topics in the Commission's Report, which is publicly available.

13.    The topics upon which the Aviation Defendants would depose John include:

a.    The information that the CIA, the FBI and John had before September 11, 2001 regarding Khalid al-Midhar, including his contact with Nawaf al-Hazmi; any connection between Khalid al-Midhar and al-Qaeda; the likelihood that Khalid al-Midhar had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA or any Aviation Defendant.

b.    The information that the CIA, the FBI, and John had before September 11, 2001, regarding Khalid al-Midhar's entry into the United States, including that there was no record of his departure and whether this information was shared with the FAA or any Aviation Defendant.

c.    The basis of John's statement in July 23, 2001 that "Khalid Midhar should be [of] very high interest," which John repeated in his statement in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.).

d.    The information that the CIA, the FBI and John had before September 11, 2001 regarding Nawaf al-Hazmi, any connection between Nawaf

al-Hazmi and al-Qaeda; the likelihood that Nawaf al-Hazmi had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA or any Aviation Defendant.

e.  The CIA's role in designating individuals for a "no fly" list, including the criteria for designating an individual as "no fly," the scope of any such list that existed on September 11, 2001, and whether and how such a list or any terrorist watch-list was communicated to the FAA and/or any Aviation Defendant.

f.  Whether the CIA requested the FAA to place Khalid al-Midhar and/or Nawaf al-Hazmi on a "no fly" list before September 11, 2001.

g.  Whether the CIA had information before September 11, 2001 indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

h.  Whether the CIA considered the intelligence that it had before September 11, 2001 to be actionable.

i.  The communications, if any, between the CIA and the FAA and/or any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

j.  The communications, if any, between the FBI and the CIA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

k.  The information that the CIA had before September 11, 2001 regarding a man identified as "Khallad", including any information regarding the likelihood of an attack organized by Khallad and/or al Qaeda and any information regarding any connection between Khallad and any of the 19 hijackers who took part in the September 11 terrorist attacks.

l.  The basis of John's statement in July 23, 2001 that "When the next big op is carried out by UBL hardcore cadre, Khallad will be at or near the top of the command food chain – and probably nowhere near either the attack site or Afghanistan.  That makes people who are available and who have direct access to him of very high interest," which John repeated in his statement in *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.).

8

14.    The Aviation Defendants submit that John's testimony is clearly appropriate under the considerations listed in 32 C.F.R. § 1905.4(c). The deposition testimony sought by the Aviation Defendants would cover only those areas upon which John has previously given a statement to a U.S. Court in *U.S. v. Moussaoui*, in an open proceeding. It is clear therefore that the CIA has already concluded that disclosure of this information would not infringe any relevant privilege, would not violate any applicable statute, would not be inconsistent with John's responsibility to protect intelligence sources and methods, would not violate any CIA directive or regulation, would not reveal classified information, would not reveal trade secrets or proprietary confidential information, and would not unduly interfere with the orderly conduct of the CIA's functions.

15.    By contrast, a refusal of the CIA to permit John's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation. The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community. *See, e.g.,*

Domestic Air Transportation System Security Act, 49 U.S.C. § 44904 (1994); Aviation

Security Improvement Act of 1990, Pub. L. No. 101-640, § 111, 104 Stat. 3066, 3080.

DESMOND T. BARRY, JR.

Sworn to before me this
6th day of March 2007

Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/____ 2010

10

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH PROPERTY DAMAGE          Civil No.
AND BUSINESS LOSS LITIGATION                              21 MC 101 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – – X

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

IN RE SEPTEMBER 11TH LITIGATION                       Civil No.
                                                                                21 MC 97 (AKH)


– – – – – – – – – – – – – – – – – – – – – – – – – – – X

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK  )

DESMOND T. BARRY, JR., being duly sworn, deposes and says:

      1.      I am an attorney admitted to practice before this Court and a member of

the law firm of Condon & Forsyth LLP. I serve as Aviation Defendants' Liaison Counsel

in the above-captioned actions. I make this Affidavit in connection with the Aviation

Defendants' request to depose the witness identified as "Mary" in *U.S. v. Moussaoui*,

Crim. No. 01-455A (LMB) (E.D.Va.), in accordance with 28 C.F.R. § 16.21 *et seq.* Mary

is identified in *U.S. v. Moussaoui* as an FBI agent, who was detailed to the Usama Bin

Laden Unit in the Counterterrorism Section (CTC) of the CIA from 1998 through 2001.

      2.      The above-captioned lawsuits seek to impose billions of dollars in liability

against the Aviation Defendants for their alleged failure to detect and halt the terrorists

who attacked the United States on September 11. The Aviation Defendants are being

sued by approximately six dozen personal injury and wrongful death claimants for injuries and fatalities that resulted from the hijackings of four flights on that morning by members of al-Qaeda. Numerous property damage and business loss plaintiffs have also brought claims for billions of dollars in damages against the Aviation Defendants for the destruction of real property and business interruption caused by the terrorist attacks.

3.    Both sets of plaintiffs have brought claims for negligence, and their suits center around the same two core issues: what the Aviation Defendants knew or should have known before September 11 regarding the terrorist threat that al-Qaeda and Usama Bin Laden posed to domestic civil aviation; and what countermeasures the Aviation Defendants could or should have taken in response to that threat. Specifically, plaintiffs allege that the Aviation Defendants did not design or take appropriate countermeasures to guard against terrorist attacks by al-Qaeda or Usama Bin Laden in response to the available intelligence. Plaintiffs also allege that the Aviation Defendants failed to comply with applicable federal aviation regulations and failed to institute countermeasures that went beyond those required by the regulations, to the extent that such additional measures were necessary to meet their supposed duties under common law.

4.    In light of plaintiffs' allegations, evidence regarding the intelligence available before September 11 to the FBI, the CIA, the FAA and the airlines regarding the terrorists' intent, likely means of attack, and capabilities, as well as the uses to which

2

that intelligence was put and with whom that intelligence was shared is critical to the Aviation Defendants' defense.

5.      Together, the FBI and the CIA are the federal agencies tasked with collecting intelligence on possible terrorist attacks against the United States.  Their responsibilities before September 11 included collecting intelligence regarding the threat of attacks against civil aviation by al-Qaeda or Usama Bin Laden.  As part of its mandate, the FBI also had the obligation to decide which specific intelligence regarding the potential threat should be communicated to the FAA and, in turn, the airlines, including the Aviation Defendants.  The intelligence that the FBI and the FAA communicated to the airlines was the Aviation Defendants' primary source of information regarding the threat of terrorist attacks on civil aviation.  Therefore, evidence as to the specific intelligence the FBI recommended be shared with the airlines regarding possible terrorist attacks by al-Qaeda or Usama Bin Laden is vital to the Aviation Defendants' defense of the allegation that they were negligent in failing to prevent the attacks on September 11.

6.      The FBI also participated in the process of determining when new countermeasures were necessary to protect the public, because the FAA received much of its intelligence concerning the terrorist threat to domestic civil aviation from the FBI. The FBI evaluated whether its intelligence indicated that the threat of terrorist attacks had materially increased such that the information should be shared with other federal agencies, including the FAA.  The FAA then directed the airlines to implement whatever new or amended security procedures it determined were appropriate to guard against the

3

heightened threat.  The intelligence the FBI communicated to the FAA was thus an important basis of any new security protocols that the FAA required -- or elected not to require -- the airlines to follow in the months preceding September 11, 2001.

7.    The measures that the FBI recommended as appropriate responses to the intelligence it had regarding the terrorist threat are also important to the Aviation Defendants' defense.  As one of the two key intelligence gathering agencies of the federal government, the FBI had far more and far more specific information regarding al-Qaeda and Usama Bin Laden's intentions to commit attacks against the United States and their likely means of attack than did the Aviation Defendants.  Plaintiffs contend that the Aviation Defendants should have revised their security procedures in light of an escalating threat of terrorist attacks.  However, the Aviation Defendants anticipate that the evidence will show that the federal government, armed with far more detailed information as to the activities of al-Qaeda and Usama Bin Laden, made the decision not to change the countermeasures it had in place -- nor did it recommend or require that the airlines adjust their security procedures.  The measures that the FBI determined that it should take in response to the intelligence it had available to it, sheds light on whether the Aviation Defendants acted reasonably in response to the more limited intelligence that they had available to them.

8.    Mary is well qualified to testify to these material issues.  As an FBI agent detailed to the Usama Bin Laden Unit in the Counterterrorism Section (CTC) of the CIA from 1998 through 2001, Mary is believed to have collected substantial intelligence

4

information concerning al-Qaeda, Usama Bin Laden, and their operatives. Even before September 11, Mary had begun to investigate two of the terrorists who later took part in the attack, Khalid al-Midhar and Nawaf al-Hazmi, as well as their connection to known al-Qaeda operatives and the possibility that they were present in the United States. Because of her work with the Usama Bin Laden Unit and her investigation into two of the hijackers, Mary has specialized knowledge of the terrorists' intent, likely means of attack, capabilities, and activities in the months leading up to September 11.

9.    One of the Aviation Defendants' main defenses in this action is that the fanatical terrorists who intentionally carried out the well-planned and highly coordinated attacks of September 11 are responsible for the injuries and damages caused by their attacks. The Aviation Defendants believe that because of her investigation into Mr. Moussaoui, Mary has specific knowledge of the unique skills and planning that went into al-Qaeda's plot. Accordingly, she is particularly qualified to offer evidence as to the manner in which the terrorists caused the injuries on which the plaintiffs base these actions. The Aviation Defendants expect that the deposition testimony of Mary will establish or tend to establish the following points in support of their defense. First, with careful study of the civil aviation system, the terrorists formulated a hijacking plot that was intended to minimize the chance that they would be detected. Indeed, their plan was specifically designed to permit them to circumvent the multilayered system of aviation security that was in place before September 11. Second, the terrorists worked around the security measures that were in place. As a result, the success of their plot was not

5

dependent on whether the Aviation Defendants failed to fulfill their responsibilities under the aviation security system mandated by the FAA.

10.    The Aviation Defendants also anticipate that Mary will testify that, before September 11, the FBI and the CIA knew that Khalid al-Midhar and Nawaf al-Hazmi were al-Qaeda operatives and known threats to the United States. They also expect that Mary will testify that the FBI knew or suspected that both men were present in the United States before September 11. The Aviation Defendants further believe that Mary will testify that no communication was sent to the FAA requesting that the two men be placed on a "no-fly" list – even though such a list existed and even though on August 22, 2001 Mary asked a co-worker to put both men on other government watch-lists and indicate that going forward they should be denied entry into the United States. The Aviation Defendants expect that Mary's deposition testimony and other litigation discovery will help establish that if Khalid al-Midhar and Nawaf al-Hazmi had been placed on a no-fly list they would not have been permitted to board Flight 77 on September 11 and, at a minimum, its hijacking would have been prevented.

11.    By virtue of her position with the FBI and her detail to Usama Bin Laden Unit in the Counterterrorism Section of the CIA, Mary also is uniquely qualified to testify as to the intelligence that was available to both agencies before September 11 concerning the possibility that al-Qaeda or Usama Bin Laden would commit a terrorist attack on the United States and its civil aviation system. Mary can also testify as to which portions of the intelligence that the FBI and the CIA gathered regarding the threat of a terrorist attack

were communicated to the FAA and offer evidence as to what, if any, countermeasures the intelligence agencies recommended that the airlines take in response to the available intelligence.

12.     Mary has already provided a statement to a federal court concerning many of these material issues. In *U.S. v. Moussaoui*, Crim. No. 01-455A (LMB) (E.D.Va.), a statement authored by Mary attesting to what she would testify to if called as a witness was read into the record in a proceeding open to the public. A copy of Mary's statement remains available to the public on the website established by the Court at http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/940.pdf.     Mary was also interviewed about these issues by the National Commission on Terrorist Attacks Against the United States (more familiarly known as the "9/11 Commission") and is frequently cited as an authority on these topics in the Commission's Report, which is publicly available.

13.     The topics upon which the Aviation Defendants would depose Mary include

    a.  The information that the FBI, the CIA, and Mary had before September 11, 2001 regarding Khalid al-Midhar, including his contact with Nawaf al-Hazmi; any connection between Khalid al-Midhar and al-Qaeda; the likelihood that Khalid al-Midhar had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA and/or any Aviation Defendant.

    b.  The information that the FBI, the CIA, and Mary had before September 11, 2001, regarding Khalid al-Midhar's entry into the United States, including that there was no record of his departure and whether this information was shared with the FAA and/or any Aviation Defendant.

7

c.  The information that the FBI, the CIA, and Mary had before September 11, 2001 regarding Nawaf al-Hazmi, any connection between Nawaf al-Hazmi and al-Qaeda; the likelihood that Nawaf al-Hazmi had participated in or planned to participate in any terrorist attacks; and whether that information was shared with the FAA or the Aviation Defendants.

d.  Mary's request to a coworker on August 22, 2001 that Khalid al-Midhar and Nawaf al-Hazmi be placed on a "U.S. watch-list", including the consequences of placing persons on the watch-list and whether this information was communicated by the FBI to the FAA and/or any Aviation Defendant.

e.  The basis of Mary's statement to FBI analyst Dina Corsi in a voicemail in August 22, 2001 that it was imperative to find Khalid al-Midhar and Nawaf al-Hazmi.

f.  The FBI's role in designating individuals for a "no fly" list, including the criteria for designating an individual as "no fly," the scope of any such list that existed on September 11, 2001, and whether and how such a list or any terrorist watch-list was communicated to the FAA and/or any Aviation Defendant.

g.  Whether the FBI made any request to the FAA to place Khalid al-Midhar and/or Nawaf al-Hazmi on a "no fly" list before September 11, 2001.

h.  Whether the FBI had information before September 11, 2001 indicating that a terrorist attack would likely target civil aviation, would take place within the United States, and would involve the use of hijacked aircraft as weapons against ground targets.

i.  Whether the FBI considered the intelligence that it had before September 11, 2001 to be actionable.

j.  The communications, if any, between the FBI and the FAA and/or any defendant before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

k.  The communications, if any, between the FBI and the CIA before September 11, 2001 regarding the possibility of an al-Qaeda attack on civil aviation.

8

14.    The Aviation Defendants submit that Mary's testimony is clearly appropriate when all of the factors listed in 28 C.F.R. § 16.26 are taken into consideration. Given that Mary has already provided a statement to the Court in *U.S. v. Moussaoui* in an open proceeding and that her statement remains publicly available, the FBI has already concluded that disclosure would not infringe an applicable privilege, violate a statute or regulation, reveal classified information, reveal a confidential source or informant, reveal investigative records or interfere with enforcement proceedings, or improperly reveal trade secrets. Moreover, the significance of the liability sought to be imposed, the national gravity of the underlying events, and the importance of the legal issues presented all militate in favor of Mary's testimony.

15.    By contrast, a refusal to permit Mary's deposition would deprive the Aviation Defendants of evidence that is important to its defense of the very serious allegations that have been made against them in this important civil litigation. The Aviation Defendants are defending against allegations that they were responsible for gathering and assessing information regarding the threat of a terrorist attack and for designing appropriate countermeasures. The Aviation Defendants contend that their role was limited to implementing the security measures mandated by the FAA based on threat assessments made by the FAA and the federal intelligence community, including the FBI. *See, e.g.,* Domestic Air Transportation System Security Act, 49 U.S.C. § 44904(a) (1994) ("The Administrator of the Federal Aviation Administration and the Director of

9

the Federal Bureau of Investigation jointly shall assess current and potential threats to the

domestic air transportation system.").

DESMOND T. BARRY, JR.

Sworn to before me this
___ day of March 2007

Notary Public

MARIA PAGAN
Notary Public, State of New York
No. 01PA4670337
Qualified in Queens County
Commission Expires 10/31/____

10